**EIDOS DISPLAY, LLC, Eidos III, LLC, Plaintiffs,**

v.

**CHI MEI INNOLUX CORPORATION, Chi Mei Optoelectronics USA, Inc., Chunghwa Picture Tubes, Ltd., Hannstar Display Corporation, Hannspree North America, Inc., Defendants.**

CIVIL ACTION NO. 6:11–CV–00201–JRG

United States District Court, E.D. Texas, Tyler Division.

Signed 06/13/2017

Cass W. Christenson, Claire M. Maddox, Pro Hac Vice, Gaspare J. Bono, McKenna Long & Aldridge LLP, Eric Y. Wu, Robert Tyler Goodwyn, IV, Dentons US LLP, Washington, DC, Matthew T. Milam, William Joseph Cornelius, Jr., Jen-

nifer Parker Ainsworth, Wilson Robertson & Cornelius PC, Tyler, TX, Renzo Nicola Rocchegiani, Dentons US LLP, San Diego, CA, for Plaintiffs.

Stanley M. Gibson, Jessica P.G. Newman, Jeffer Mangels Butler & Mitchell LLP, Los Angeles, CA, Gregory S. Cordrey, Jeffer Mangels Butler & Mitchell LLP, Irvine, CA, Herbert A. Yarbrough, III, Yarbrough Wilcox, PLLC, Tyler, TX, for Defendants.

## ORDER

JOHN D. LOVE, UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendants Chi Mei Innolux Corporation, Chi Mei Optoelectronics USA, Inc. ("Innolux"), and Chughwa Picture Tubes, Ltd. ("CPT") (collectively "Defendants") Second Renewed *Daubert* Motion to Exclude Certain Opinions of Plaintiffs' damages expert, Arthur Cobb. (Doc. No. 807.) Plaintiffs Eidos III, LLC, and Eidos Display LLC ("Eidos") filed a response. (Doc. No. 811.) Upon consideration, and for the reasons stated herein, Defendants' Motion (Doc. No. 807) is **GRANTED-IN-PART** and **DENIED-IN-PART** as set forth herein.

The Court has twice now granted Defendants' *Daubert* Motions on the issue of Mr. Cobb's estimation of indirect sales in the United States to prove damages for indirect infringement. (Doc. Nos. 713, 801.) On June 5, 2017, the Court held an extensive hearing to discuss the problems with Mr. Cobb's report, and generally, the evidence of importation or indirect sales within the United States. On that same day, the Court issued its second memorandum opinion explaining that Mr. Cobb had not complied with the Court's previous memorandum opinion finding Mr. Cobb's methodology of estimating percentage of U.S. sales unreliable. (Doc. No. 801.) The Court explained that Mr. Cobb had not articulated a reliable basis to use the generic percentages he generated and that they suffered from several speculative leaps that failed to address or even reliably estimate a percentage of U.S. sales attributable to any one Defendant's customers or accused products. *Id.* at 4. The Court noted that, in his supplemental report, "Mr. Cobb has provided no data to tie his estimate of U.S. sales to infringing products by a particular Defendant." (Doc. No. 801, at 4.) Nonetheless, the Court gave Mr. Cobb one last opportunity to comply with the Court's orders, and permitted him to file a second supplemental report. (Doc. No. 801, at 6.)

In his second supplemental report, Mr. Cobb relies on the same data and evidence and applies the same impermissible methodology that the Court has twice now said would not be admissible. Specifically, to generate a percentage of U.S. sales of infringing products, Mr. Cobb relies on the following three data points: (1) Eidos's declarant, Mr. Ho Lee's, statement that LCD manufacturers would have "generally understood that 30% or more of their LCD products manufactured and shipped worldwide would eventually enter and be sold in the U.S. market;" (2) Innolux's 30(b)(6) representative who testified in deposition that for the worldwide LCD market, the United States makes up "(m)ore than 20 percent" of the market; and (3) Mr. Cobb's recollection of a prior trial he had against CPT, where CPT's expert estimated that approximately 30 percent of CPT products ultimately were sold in the United States through 2006. Cobb 2d Supplemental Report at 3–4. Based on this data, Mr. Cobb applies a 25% of total worldwide sales of accused infringing products to reach a royalty base for indirect sales of accused products in the United States. *Id.* at 5. By his own admission, Mr. Cobb states he cannot calculate damages as required by the Court's prior orders "because the available data does not report

this level of precision." Cobb 2d Supplemental Report at 1.

■ The Court cannot permit Mr. Cobb to testify to his 25% estimation of U.S. sales because it is impermissibly speculative and based on unreliable data. As this Court has previously noted, this case presents issues very similar to the damages expert's testimony in *Power Integrations*. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348 (Fed. Cir. 2013)

In *Power Integrations*, after the district court granted a remittitur on damages, the court reduced the jury's damages findings by 82% based on the testimony from Power Integrations' expert that 18% of Samsung's worldwide sales were eventually imported into the United States. *Power Integrations*, 711 F.3d at 1374. In that case, Power Integrations' expert had relied on two documents in support of his testimony: (1) a document that showed worldwide shipments for Samsung mobile phones for the third quarters of 2004 and 2005; and (2) a document that indicated total sales of Samsung mobile phones in the United States during the third quarter of 2005. *Id.* at 1375. The Federal Circuit found Power Integrations' expert's opinions "impermissibly speculative" because the data on which he relied included no reliable indicator to identify infringing sales and was based on his assumption that all purported U.S. sales included infringing circuits. *Id.* at 1376.

Here, while Mr. Cobb starts with a base of accused products sold worldwide, his application of a percentage to estimate sales in the United States is equally speculative. As a preliminary matter, Mr. Cobb generates his 25% from the testimony of three other individuals who were speculating as to what their general estimates of total LCD products sold in the U.S. market would be. Even if the Court could accept Mr. Cobb's reliance those speculative statements, the critical problem with Mr. Cobb's application of his 25% is that he has no opinions or testimony to support a conclusion that such a percentage would be an appropriate representation of the number of each Defendants' *accused infringing products* that were shipped into the United States. Moreover, in *Power Integrations*, the damages expert had at least some data specific to a U.S. customer that showed a portion of U.S. sales. *Power Integrations*, 711 F.3d at 1375. Here, Mr. Cobb has no such data. He relies on the same general market statistics from Mr. Lee and Mr. Shao–Yin Chang that this Court has already rejected because "they account for a percentage of an entire market and are not limited or tailored to the importation or sale of any one Defendant's infringing products." (Doc. No. 801, at 5.) While the testimony Mr. Cobb relies on from CPT's former expert in a separate litigation relates to an estimate of CPT products sold in the United States, that estimate is also fatally flawed because it gives no indication that that percentage accounts for sales of the alleged infringing products. Rather, it appears to be a general estimation of all CPT products sold in the United States in 2006 that is loosely based off of Mr. Cobb's recollection of that trial.

Plaintiffs argue that Mr. Cobb's opinions are admissible because he can provide a hypothetical negotiation analysis for a U.S. only license to the patent-in-suit. (Doc. No. 811, at 9–12.) But Plaintiffs cannot fix Mr. Cobb's opinions under the guise of a hypothetical negotiation. Indeed, such predictions would not cure his unreliable methodology employed to estimate the number of indirect sales in the United States. Rather, Plaintiffs' argument suggests that hypothetical negotiations are always admissible and reliable. This is not the case. While the Court previously did not exclude the third party licenses on which Mr. Cobb

relies, the Court ultimately made no ruling as to their admissibility. (Doc. No. 751, at 2.) However, at this point, given that Mr. Cobb's damages opinions as to indirect sales have been deemed inadmissible, these third party licenses cannot stand alone to support damages for indirect infringement in the context of a hypothetical negotiation. While these licenses may be informative and comparable, they do not reliably support an estimate of indirect sales of each Defendants' accused infringing products in the United States—the critical aspect that is missing from Mr. Cobb's opinions. Therefore, in light of the Court's rulings, the Court finds it necessary to exercise its gate keeping authority to keep such opinions from the jury.

█ In sum, Mr. Cobb's 25% application to worldwide sales of accused products impermissibly assumes that the percentages of the entire LCD market in the United States necessarily correlates to sales of a particular Defendant's infringing products. While Mr. Cobb contends he does not have the data he needs to provide the level of precision the Court has required, this case has been pending since 2011 and the Court has repeatedly opened the door for damages experts to supplement their opinions and seek additional discovery. Notably, while the parties filed numerous discovery motions in this matter, the fact that Mr. Cobb did not have sufficient data to estimate indirect sales was never squarely raised with the Court.[1] Rather, until the Court issued its first *Daubert* ruling, Plaintiffs were convinced they had a supportable theory to prove damages for indirect infringement based upon general market statistics. *See* Objections Doc. No. 729, at 5 ("It is not necessary (or possible) to calculate inducement damages based on each individual infringing import or sale by third parties. Instead, Eidos is permitted to assert inducement as to 'an entire category of infringers (*e.g.*, the defendant's customers)' and 'may consequently seek damages or injunctions across the entire category.' "). As the Court explained then, and continues to explain now, the Court's ruling was never that damages must be proved by each individual infringing import. Rather, the Court instructed Eidos that the damages had to be tied to the specific facts of this case and calculated using reliable methodologies. *See* Doc. No. 713, at 12 ("Mr. Cobb must provide damages opinions for Eidos's claims of indirect infringement only where there is specific evidence of importation or sales by a specific customer such that Mr. Cobb can *apply reliable principles and methods that are closely tied to the facts of this case.*") (emphasis added). Mr. Cobb has yet to provide opinions that would be permissible under *Daubert*. For these reasons, the Court finds Mr. Cobb's use of a 25% portion of U.S. sales speculative and inadmissible. He will not be permitted to provide such opinions at trial. Similarly, Mr. Cobb cannot rely on third party licenses to testify to indirect damages. Defendants' Second Renewed *Daubert* Motion (Doc. No. 807) is **GRANTED** as to Mr. Cobb's opinions on indirect sales.

Finally, as to Defendants' challenge to Mr. Cobb's 1% royalty rate, the Court finds that Mr. Cobb may assert his 1% royalty rate so long as he can provide a reliable analysis as to why his rate increases from .75% to 1% for his TFT array base. To be clear, this cannot be the same reasoning this Court has already rejected in its prior Order. *See* Doc. No. 801, at 6–7 ("The concept that with a smaller base a patent holder would have negotiated for a

---

1. As the Court explained in its order denying adverse instructions, "[t]o the extent the information produced was incomplete or unclear, the Court never saw any motion practice to compel this information." (Doc. No. 804, at 4.)

higher rate does not supportably justify Mr. Cobb's doubling of the royalty rate here. Indeed, since the goal of the patent holder is always to negotiate for the highest rate it can achieve, this concept permeates all hypothetical negotiations and has no bearing on the value of the infringing technology.") To the extent Mr. Cobb cannot provide a reliable explanation based on his testimony (not already rejected by the Court), he shall opine as to his .75% rate set forth in his original expert report. Therefore, Defendants' Motion (Doc. No. 807) is **DENIED** as to Mr. Cobb's 1% rate.

## CONCLUSION

As directed herein, Defendants' Motion (Doc. No. 807) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

**So ORDERED and SIGNED this 13th day of June, 2017.**